# GINGER ROUNTREE v. LERNER DEVELOPMENT COMPANY ET AL.

[No. 1552, September Term, 1981.]

*Decided July 20, 1982.*

The cause was argued before MOYLAN and MOORE, JJ., and MORRIS TURK, Associate Judge of the Fifth Judicial Circuit, specially assigned.

*Ronald M. Miller* for appellant.

*Alan R. Siciliano* for appellees.

MOYLAN, J., delivered the opinion of the Court.

On January 15, 1977, the appellant, Ginger Ruth Rountree, slipped and fell on a step covered with ice leading from her apartment in the University Square Garden Apartments in Greenbelt, Maryland. She sustained a fracture of her left shoulder and extensive damage to her right knee cartilage. As a result, she brought suit against the Lerner Corporation and the Lerner Development Company, the owner and operator, respectively, of the University Square Garden Apartments. The case was tried before a jury in the Circuit Court for Prince George's County, with Judge Samuel Meloy presiding. At the end of the appellant's case, Judge Meloy granted the defendant/appellees' motion for a directed verdict, ruling as a matter of law that the appellant had assumed the risk of her fall. On this appeal from the judgment entered against her, the appellant contends that the trial court erred in directing a verdict against her.

In assessing the correctness of the court's ruling, we proceed to examine the evidence in the light most favorable to the appellant. The appellant and her sister rented an apartment, described at 122 Westway Apartment Number 103, at the University Square Garden Apartments in June, 1975. The apartment complex is a large one with at least forty separate apartment buildings. It was owned by the appellee Lerner Corporation and managed by the appellee Lerner Development Company. Lerner Development Company was responsible for the exterior maintenance and upkeep of the apartments, including removal of ice and snow from the walkways and steps leading to the apartments.

During January, 1977, the metropolitan Washington area experienced heavy precipitation, including snow and ice. The day before the accident, January 14, 1977, the appellant left her place of employment at the Department of Justice around 6:00 p.m. and arrived at her apartment around 6:30 p.m. She thereafter went to Waldorf, Maryland, to a concert. There was a drizzling rain. She left the concert at approximately 10:00 p.m. and returned to her home in Greenbelt at approximately 12:30 a.m. The weather had become more severe. There was a freezing rain. Conditions

on the street were glassy and slick. She parked her car at the Jewish Community Center parking lot, which she testified was the only safe and available parking area that evening, and walked to her apartment building. The steps on which she fell the next day were wet but not covered with ice, and she had no trouble going down the steps leading from Westway to her apartment building.

On Saturday morning, the appellant awoke at 5:30 or 6:00 a.m. She was required to work overtime that day to prepare the Congressional budget charts. She went to her balcony, which faced the 124-126 Westway buildings, and noticed an accumulation of ice and snow. From her apartment, however, she could not see the steps on which she ultimately fell but only the buildings behind her apartment and the lower sidewalk leading to the rear parking lot. Although she normally started work at 9:00 a.m., because of the weather conditions she decided to leave her apartment late so that the streets and pathways could be cleared.

The appellant left her apartment building around 9:00 a.m. Seeing the snow and ice on the sidewalk, she proceeded with great caution. The sidewalk — between her building and the four steps leading to a sidewalk directly adjacent to Westway — was approximately 160 feet long. She walked alongside the sidewalk, where there was caked snow. When she reached the steps, she got back onto the sidewalk to go across a small drainage culvert and up the steps. She had to use the steps because there was a steep bank next to the steps on both sides which was impassable. She testified that when she reached the steps, "I knew it was slick and icy, so I would have to be very careful because these steps — you take one or two steps per step and they are downhill; they slant back to you, so that it was going to be extremely diffi-cult for me to get up these steps because of the way they slant." Additionally, there was no handrail or grip to aid her in ascending the stairs. The steps were wide and elongated. The appellant was able to traverse the first two steps. As she attempted to step from the third step onto the top step, however, her left foot slipped out from under her while she

was raising her right foot. She fell face forward, spread-eagle fashion. She was unable to get back on her feet for some time and kept sliding backwards on the downward-slanted icy steps. When she finally managed to get to the sidewalk, she looked down to her right to the next group of apartments and saw men clearing the sidewalks.

Taking that version of the facts most favorable to the appellant, we have no difficulty in concluding that there was at least a jury issue as to whether she was free of having assumed the risk. Both the appellant and the appellee seem obsessed with the question of whether the appellant did or did not have knowledge of the icy and dangerous condition of the walkways and steps. That is simply one of two limitations on the defense of assumption of risk, however. As Professor Prosser points out in his *Law of Torts,* (4th ed. 1971), at p. 447:

> "The defense of assumption of risk is in fact quite narrowly confined and restricted by two requirements: first, that the plaintiff must know and understand the risk he is incurring, and second, that his choice to incur it must be entirely free and voluntary."

With respect to that second restriction on the availability of the defense, Prosser explains, at p. 450:

> "The second important limitation upon the defense of assumption of risk is that the plaintiff is not barred from recovery unless his choice is a free and voluntary one. There must first of all, of course, be some manifestation of consent to relieve the defendant of the obligation of reasonable conduct. It is not every deliberate encountering of a known danger which is reasonably to be interpreted as evidence of such consent. The jaywalker who dashes into the street in the middle of the block, in the path of a stream of cars driven in excess of the speed limit, certainly does not manifest consent that they shall use no care and run him down. On the con-

trary, he is insisting that they shall take immediate precautions for his safety; and while this is certainly contributory negligence, it is not assumption of risk."

On the facts of this case, there may have been clear and decisive evidence of a "deliberate encountering of a known danger" but that fact, even if assumed to be true, is not dispositive of the issue of assumption of risk. In this case, the tenant had a right to egress from her apartment. She had a right to assume that the landlord would take all appropriate steps to make safe egress possible. Whether the landlord did or did not is another issue and not the one upon which this case was decided. There was evidence that the appellant delayed her departure for work so that both the sun and the workmen would have additional time to ameliorate the icy conditions. There was evidence that there was no alternative route of egress from the appellant's apartment. Under the circumstances, the further exposition of Prosser is highly pertinent at p. 451:

"Even where the plaintiff does not protest, the risk is not assumed where the conduct of the defendant has left him no reasonable alternative. Where the defendant puts him to a choice of evils, there is a species of duress, which destroys all idea of freedom of election. Thus a shipper does not assume the risk of a defective car supplied him by a carrier where the only alternative to shipment in it is to let his cabbages rot in the field; and *a tenant does not assume the risk of the landlord's negligence in maintaining a common passageway when it is the only exit to the street.* In general, the plaintiff is not required to surrender a valuable legal right, such as the use of his own property as he sees fit, merely because the defendant's conduct has threatened him with harm if the right is exercised. . . . By placing him in the dilemma, the defendant has deprived him of his freedom of choice,

and so cannot be heard to say that he has voluntarily assumed the risk." (Emphasis supplied)

If there had been evidence in this case that there was a reasonable and safe alternative route of egress open to the appellant and that she deliberately chose the shorter but more dangerous route, that might well establish as a matter of law that she was guilty of having assumed the risk. She would have run afoul of Professor Prosser's admonition, at pp. 451-452:

". . . [W]here there is a reasonably safe alternative open, the plaintiff's choice of the dangerous way is a free one, and may amount to both contributory negligence and assumption of risk."

In this case, however, there was no evidence of any "reasonably safe alternative open" and there was, at the very least, a jury issue with respect to the "voluntary assumption" restriction on the defense of assumption of risk.

*Judgment reversed; case remanded for further proceedings; costs to be paid by appellees.*