961 A.2d 1141

David **ALLEN**

v.

**MARRIOTT WORLDWIDE CORPORATION, et al.**

**No. 2618, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Dec. 8, 2008.

Kevin J. Finnegan (Goldberg, Finnegan & Mester, LLC, on the brief), Silver Springs, for appellant.

Stephen S. McCloskey (Semmes, Bowen & Semmes, on the brief), Baltimore, for appellee.

Panel: WOODWARD, GRAEFF, CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

462

CHARLES E. MOYLAN, JR., J., Retired, Specially Assigned.

On January 5, 2007, the appellant, David Allen, filed suit in the Circuit Court for Montgomery County against the appellees, Marriott Worldwide Corporation doing business as The Residence Inn ("Marriott"), and the Brickman Group Ltd. ("Brickman Group"). The suit charged the appellees with negligence and premises liability. It is a classic "slip and fall" scenario, in this case involving a slip and fall on ice. The significance of the case is that the slip and fall occurred not on "white ice" but on "black ice". The defense was that of assumption of risk.

## Factual Background

Marriott owns and operates a Residence Inn Hotel in Ellicott City, Maryland. The Brickman Group is the contractor hired by Marriott to be responsible for snow and ice removal and for surface treatment at the Ellicott City Residence Inn. From February 3 through February 5, 2004, the appellant was a guest at the Residence Inn. On the morning of February 5, the appellant and his wife, Elizabeth Allen, checked out of the Residence Inn at approximately 8:00 A.M. As the appellant checked out, Mrs. Allen went to the hotel's parking lot to get the car. She drove the car close to the front entrance way and awaited her husband. As the appellant left the main entrance of the hotel, he first walked along the sidewalk in the general direction of where his wife was waiting with the car. As the appellant then stepped off the curb, pulling a "wheelie" suitcase, he slipped and fell on what turned out to be a patch of unseen ice.

## Procedural Background

On October 12, 2007, each of the appellees filed a Motion for Summary Judgment. Each argued that, even assuming the truth of the appellant's allegations, the appellees were entitled to judgment as a matter of law under the affirmative defense of assumption of risk. That is the only issue in this case.

The appellant filed his opposition to both motions and filed an affidavit in support of his opposition memorandum. A hearing on summary judgment was conducted by Judge Ronald B. Rubin on December 3, 2007. On December 7, Judge Rubin entered orders granting summary judgment in favor of the appellees. The appellant has taken this timely appeal.

## The Assumption of Risk On Snow and Ice

 The Maryland law on the defense of assumption of risk in cases involving slipping and falling on ice or snow is totally contained within the three decisions of *Schroyer v. McNeal*, 323 Md. 275, 592 A.2d 1119 (1991); *ADM Partnership v. Martin*, 348 Md. 84, 702 A.2d 730 (1997); and *Morgan State University v. Walker*, 397 Md. 509, 919 A.2d 21 (2007). In *Schroyer*, 323 Md. at 282, 592 A.2d 1119, Judge (later Chief Judge) Bell laid out the point of departure for our analysis with a basic definition of the defense of assumption of risk (quoting from *Gibson v. Beaver*, 245 Md. 418, 421, 226 A.2d 273 (1967)):

> *When the plaintiff enters voluntarily into a* relation or *situation involving obvious danger, he may be taken to assume the risk,* and to relieve the defendant of responsibility. *Such implied assumption of risk requires knowledge and appreciation of the risk, and a voluntary choice to encounter it.*

(Emphasis supplied).

 Judge Bell also made it clear that the test for whether a plaintiff has assumed the risk of injury is an objective one that ordinarily should be decided by a jury but, when the risk is fully known and understood, may be decided by the court as a matter of law.

> *The test* of whether the plaintiff knows of, and appreciates, the risk involved in a particular situation *is an objective one* and ordinarily is a question to be resolved by the jury. Thus, "the doctrine of assumption of risk will not be applied unless the undisputed evidence and all permissible inferences therefrom *clearly* establish that the risk of dan-

ger was *fully* known to and understood by the plaintiff." On the other hand, *when it is clear that a person of normal intelligence in the position of the plaintiff must have understood the danger, the issue is for the court.*

323 Md. at 283–84, 592 A.2d 1119 (emphasis supplied).

With particular reference to snow and ice, *Schroyer* cited with approval W. Prosser, *Handbook of the Law of Torts* (2d ed.), § 55 at 310, as *Schroyer* stated:

The danger of slipping on ice was identified in Prosser as one of the "risks which any one of adult age must be taken to appreciate."

*Id.* at 284, 592 A.2d 1119. In the *Schroyer* case itself, the plaintiff walked out onto a parking lot covered with ice and snow but attempted to do so with utmost care. The trial court ruled that the plaintiff was entitled to recover from the motel owners. This Court affirmed that decision. *Schroyer v. McNeal,* 84 Md.App. 649, 581 A.2d 472 (1990). The Court of Appeals, however, reversed the decision of this Court, as it held that recovery was barred, as a matter of law, by the defense of assumption of risk.

It is clear, on this record, that *McNeal took an informed chance. Fully aware of the danger posed by an ice and snow covered parking lot and sidewalk, she voluntarily chose to park and traverse it, albeit* carefully, for her own purposes. . . . [I]t cannot be gainsaid that *she intentionally exposed herself to a known risk.* With full knowledge that the parking lot and sidewalk were ice and snow covered and *aware that the ice and snow were slippery, McNeal voluntarily chose to park on the parking lot and to walk across it* and the sidewalk, thus indicating her willingness to accept the risk and relieving the Schroyers of responsibility for her safety. . . . *[W]hile the issue of her contributory negligence may well have been for the jury, the opposite is true with respect to her assumption of the risk.*

*Id.* at 288, 592 A.2d 1119 (emphasis supplied).

In *ADM v. Martin,* the plaintiff was an employee of a blueprint reproduction company and was making a delivery to the business in Rockville owned by the defendants. The

plaintiff slipped and fell on an ice and snow-covered walkway as she returned to her vehicle. The trial judge granted judgment in favor of the defendants on the ground that the plaintiff, as a matter of law, had assumed a known risk. The Court of Special Appeals reversed that decision, holding that the assumption of risk was a jury question. *Martin v. ADM Partnership,* 106 Md.App. 652, 666 A.2d 876 (1995). The Court of Appeals reversed the decision of this Court, holding that the assumption of the risk had been established as a matter of law.

For the Court of Appeals, Chief Judge Bell described the situation confronting the plaintiff as she approached the building.

> Although it had snowed some nineteen hours earlier and the precipitation had ceased, ice and snow surrounded the building, particularly the parking lot directly in front of the building and the entrance walkway. *Martin testified at trial that she observed that there was ice and unplowed snow surrounding the building* when she arrived at the building, and that *she wondered why the walkways had not been cleared.* Despite the condition of the parking lot and the entrance walkway, Martin testified that, because she observed that there were other vehicles in the parking lot, that people were working inside the building, and that there were footprints in the snow and ice, suggesting that there was a safe means of ingress and egress to and from the building, *she felt that she could safely enter the building.* Martin also testified that, although her employer never told her that she could lose her job if she did not make the subject delivery, or any other deliveries she was assigned to make, she believed that she had no choice but to deliver the blueprints. As she saw it, if the delivery was not made, Ideal Reprographics could have lost that delivery contract, with the consequence that her employment could then have been terminated.

348 Md. at 88–89, 702 A.2d 730 (emphasis supplied).

On her way into the building, the plaintiff initially slipped on the ice but avoided falling by grabbing onto her vehicle. On

returning from the building, however, she again slipped, fell, and injured her lower back. In holding that assumption of risk had been established, as a matter of law, Judge Bell reiterated that the test is an objective one.

"In determining whether a plaintiff had knowledge and appreciation of the risk, *an objective standard must be applied* and *a plaintiff will not be heard to say that he did not comprehend a risk which must have been obvious to* him." Thus, *"when it is clear that a person of normal intelligence* in the position of the plaintiff *must have understood the danger, the issue is for the court."* Moreover, *"there are certain risks which anyone of adult age must be taken to appreciate: the danger of slipping on ice,* of falling through unguarded openings, of lifting heavy objects ... and doubtless many others."

*Id.* at 91–92, 702 A.2d 730 (emphasis supplied).

In *Morgan State v. Walker,* the plaintiff went to visit her daughter on the campus of Morgan State University several days after a heavy snowstorm. After "driving across a snow and ice-covered parking lot" and then parking, the plaintiff, on her return trip from her daughter's dormitory, "walked across the ice, fell, and fractured her leg." 397 Md. at 510, 919 A.2d 21. The trial judge granted summary judgment in favor of the defendant Morgan State. This Court reversed, holding that the voluntariness of the plaintiff's actions was a question for the jury. The Court of Appeals reversed the decision of this Court, holding that the assumption of risk defense had been established as a matter of law. Judge Greene described the plaintiff's actions just prior to her accident.

Respondent parked and exited her car. *She noticed snow and ice on the ground between her car and the entrance to the dormitory. She* therefore held *on to the cars next to her as she walked* to reach her daughter's building. Respondent's daughter testified that, *like the parking lot, the driveway and steps in front of her dormitory had not been cleared.* Respondent testified that *she held onto the railing when walking on the steps and walked very slowly.* She also noted that she had on Timberland boots and stated "I

mean I don't have any problems with walking or anything like that. Actually I'm a dare devil to be honest with you." She reached her daughter's dormitory without incident.

Respondent visited with her daughter for approximately one hour. On *her way back to her car, she walked slowly and tapped each car,* while looking down at the ground "to make sure that [she] didn't slip and fall." *She saw snow and ice on the ground* as she was walking and testified that she was "trying to be safe." *When Respondent reached her vehicle, she lost her footing, fell to the ground and fractured her leg*

*Id.* at 512, 919 A.2d 21 (emphasis supplied).

The holding of the Court of Appeals was unmistakably clear:

[W]hen the uncontroverted evidence demonstrated that *Respondent knowingly and voluntarily walked across a snow and ice covered parking lot and injured herself, she assumed the risk of her injuries as a matter of law.* The Circuit Court was therefore correct to grant MSU's motion for summary judgment and not send the question to the jury.

*Id.* at 514, 919 A.2d 21 (emphasis supplied).

Judge Greene's opinion emphasized the extent of the plaintiff's awareness of the clear danger of slipping and falling.

Respondent's own testimony made clear that *she was aware of the snow and ice in the parking lot.* She testified that as soon as she drove into the parking lot, *she noticed that she was driving "on crunchy ice and snow."* She stated further that she thought, "doggone, they didn't clean this parking lot." *Respondent's behavior demonstrates that she was also aware of the risk, and appreciated the risk,* of danger of walking on snow and ice. She explained that *she walked very slowly, held onto the cars as she walked, and held onto the railing as she walked slowly up the steps.* In addition, Respondent explained that *she looked down at the ground "to make sure that [she] didn't slip and* fall." Moreover, as we stated in both *ADM P'ship* and *Schroyer,*

> "[t]he danger of slipping on ice ... [is] one of the 'risks which any one of adult age must be taken to appreciate.' "

*Id.* at 519, 919 A.2d 21 (emphasis supplied).

There was, moreover, nothing involuntary about the plaintiff's assumption of the risk in *Morgan State v. Walker.*

> *Nothing* in the record *suggests that Respondent was forced against her will to confront the risk of danger of walking on the snow and ice,* such that her behavior could be classified as involuntarily. After hearing the crunch of ice and snow under her tires and acknowledging that MSU had not removed the ice and snow from the parking lot, she proceeded to get out of her car and visit with her daughter. Respondent's motivation stemmed from the fact that she believed that her daughter needed money. In accordance with our prior holdings, *Respondent's actions would be considered involuntary only if she lacked the free will to avoid the situation.* Therefore, the fact that Respondent wanted to bring her daughter money for gas does not render her actions involuntary.

*Id.* at 519–20, 919 A.2d 21 (emphasis supplied).

The opinion quickly disposed of the plaintiff's argument that she had no alternative path to take. The alternative path was to take no path at all.

> Moreover, Respondent had alternatives in this case—*as soon as she heard the ice underneath her tires, she could have turned her car around and gone home* or arranged an alternative plan by which to get her daughter money, instead of voluntarily proceeding in the face of danger by leaving her car and traversing across ice and snow.

*Id.* at 520, 919 A.2d 21 (emphasis supplied).

In terms of alternatives, the appellant in this case could have waited at the front entrance of the Residence Inn for his wife to drive up and pick him up there at that point of greater safety. He voluntarily elected to venture forth and meet her further out on the parking lot. The motivation was to save a little time.

When the issue is that of the assumption of risk, moreover, any question about the negligence of the defendant becomes utterly immaterial.

We can assume, for the sake of argument, that Respondent is correct and that *MSU was negligent in failing to clear the parking lot and walkways of snow and ice.* This assumption does not change our analysis or our conclusion. As this Court has previously explained "the assumption of the risk defense exists independently of the conduct of another person, whether the defendant or a third party. Therefore, *the existence of a defendant's duty is not an issue because that speaks to the defendant's negligence, which is not required to establish assumption of risk.*" *Id.* at 521, 919 A.2d 21 (emphasis supplied).

### Black Ice Versus White Ice

In the path of that *Schroyer–ADM Partnership–Morgan State* juggernaut, the appellant here could have uttered no peep of protest had the ice on the Residence Inn parking lot been visible. His wriggle room, and the significance of this case, lies in the distinction between "white ice" and "black ice." The appellant reminds us that the snow and ice in all three ostensibly controlling cases was visible, not only to the naked eye of the plaintiff but to the most casual viewer. It was, in the professional jargon of the tort practitioner, "white ice." The ice in this case, by contrast, was "black ice." Will that make a difference? Perhaps, but not necessarily.

The term "black ice" describes the visual impression created by a relatively thin layer of transparent ice lying over a black surface, such as tar macadam or asphalt. "White ice" describes the different visual image created by a similar layer of transparent ice lying over a white surface, such as snow. By parity of reasoning, there is no reason to suppose that there could not also be such visual phenomena as "red ice" or "yellow ice" or "blue ice" or, for that matter, "harlequin ice," but these potential phenomena have not yet made it into the lexicon of tort law. It will readily be seen that "black" and "white" do not describe the actual ice itself but, rather, the

color of the surface beneath the ice. Although the meaningful contrast should be between essentially visible ice and essentially invisible ice, the linguistic usage of attaching the chromatic adjective to the ice has nonetheless taken firm root. We are, after all, dealing with torts, not optics. "White ice" and "black ice" comfortably serve the law's purpose, and we will happily go with the flow.

### Respective Spins of the Same Facts

With only the most minimal and non-critical reference to anything else, the arguments of the appellant and of both appellees proceed from precisely the same factual base. That factual repository is the September 27, 2007, deposition of the appellant. On that same body of fact, however, the parties have imposed radically different spins.

All parties, as they should, do homage at the same doctrinal shrine, which is the listing of the elements of the defense of assumption of risk by *ADM Partnership v. Martin*, 348 Md. at 90–91, 702 A.2d 730:

> In Maryland, it is well settled that in order to establish the defense of assumption of risk, the defendant must show that *the plaintiff: (1) had knowledge of the risk of the danger;* (2) appreciated that risk: and (3) voluntarily confronted the risk of danger.

(Emphasis supplied):

The particular element in issue in this case is that of "knowledge of the risk of the danger." There is no dispute as to what the facts are. The appellant, however, spins the facts centrifugally, away from that core of knowledge. The appellees, by contrast, spin the facts centripetally, in toward the center of gravity. It is virtually a problem in Newtonian physics.

### A. The Centrifugal Spin

The appellant's spin is simple: if a plaintiff looks and cannot see the hazard, the plaintiff thereby has no knowledge of the risk. It is reasonable for a plaintiff to conclude, so runs the

argument, that if you cannot see it, it is not there. In his appellate brief, the appellant announces this leitmotif.

*Mr. Allen did not see the ice* that he slipped on so *therefore he lacked the requisite knowledge element* of assumption of the risk. He testified that *he never saw ice where he fell at any time before he fell,* that *the parking lot was black* and that *there was no white ice to be seen.*

(Emphasis supplied).

In further developing that theme, the appellant quotes selectively from those portions of his September 27, 2007 deposition in which he states that he could see no ice on the parking lot as he stepped out onto it to enter the car being driven by his wife.

Q: So it's your testimony that *you did not see the ice that you fell on* before you fell; *is that right?*

A: *Correct.*

Q: And after you fell when did you first see the ice that you fell on?

A: I knew it was ice as soon as I fell, because once I fell I was laying on it.

(Emphasis supplied).

The appellant denied any knowledge of the presence of ice.

Q: And before you fell was there ever a time that you realized you were on ice that you were standing on ice?

A: No.

The appellant returned to the theme that he could see no ice.

Q: Where did you see snow and ice?

A: On the curbs of the sidewalks in between. Right up on the curb of the—

Q: All right. And you also saw snow and ice piled against the curb, is that right?

A: Yes, sir.

Q: Can you tell me how high it was on the curb?

A: I'm going to say about even, maybe a little higher.

Q: About even with the curb?

A: Yes, sir.

Q: And was that a consistent amount the entire length of the curb, or was it in spots?

A: It changed.

Q: All right

A: It changed.

Q: Some places it was higher?

A: Yes, sir.

Q: Some places it was lower?

A: Yes, sir.

Q. And were there—did you observe places where any melt had occurred from that snow?

A. Not that I can remember, no.

Q. All right. *Did you notice any snow and ice on the sidewalk as you walked on the sidewalk?*

A. No, sir.

(Emphasis supplied). The exclusive focus of that argument, it will be noted, is on the sense of sight, as if no other path to awareness exists. In his brief, the appellant proceeds to what he deems to be the dispositive fact.

*There is simply no testimony* in the record before the Circuit Court, or before this Court, *that the black ice was visible* in the parking lot to Mr. Allen, or anyone else.

(Emphasis supplied).

He then deftly distinguishes the controlling trilogy of *Schroyer, ADM Partnership*, and *Morgan State,* pointing out that all three of those cases dealt with white ice, whereas his case involves black ice. The knowledge of the risk in those cases, the appellant reasons, came through the sense of sight, and that presumably unique, or at least vastly superior, avenue to knowledge, his argument goes on, was missing in this case.

Both Appellees, in their motions, relied on *Schroyer, ADM Partnership*, and *Morgan State University v. Walker*, 397 Md. 509, 919 A.2d 21 (2007). These cases are easily distinguishable on their facts from the instant case in almost every way imaginable. *In each of these cases, the plaintiff testified that he or she had knowledge of the presence of ice all over the spot upon which he or she fell.* In fact, *the ground was covered in ice and snow in each of these cases.* The plaintiffs in those cases testified that they knew there was ice and snow all over the walkways and/or parking lot they chose to traverse. Each plaintiff in these cases knowingly and voluntarily traversed the snow and ice and were injured after doing so more than one time. In sum, each took their chances, and the Court determined they voluntarily assumed the risk of injury as a matter of law. As set forth in detail above, *that requisite knowledge is not present in the present case.*

(Emphasis supplied).

## B. The Centripetal Spin

■ To return for a moment to the Newtonian metaphor, there is significantly more mass to the factual material circling in the appellees' argumentative orbit than the appellant wishes or chooses to compute. More mass *ipso facto* means more gravitational pull into the center. The appellees basically contend, and we agree, that the path to knowledge is not limited to the sense of sight alone. The blind may perceive the risk of danger though they may not see it. The deaf may perceive the risk of danger though they may not hear it. There are myriad epistemological modalities. Knowledge springs not only from direct sense perception but from the drawing of inferences from circumstantial evidence. Induction is as worthy a highway to knowledge as is sensation. The appellees would draw what they contend to be the objectively necessary and compelling inference in this case from a significantly broader factual data base than that supplied by sight alone.

The pertinent facts relied on by the appellees were, to begin with, not limited to observations on the morning of the accident, February 5, alone, but included information dating back to when the appellant and his wife first arrived at the Residence Inn on February 3.

Q. When you arrived at the Residence Inn after you worked on February 3rd, *did you see snow and ice in the parking lot?*

A. *I'm sure there was snow there too, yes.*

Q. Okay. How much snow did you see when you first arrived at the Residence Inn on February 3rd?

A. I don't recall exact amounts?

Q. But *you do remember seeing it?*

A. Yes.

(Emphasis supplied).

The appellant also described the presence of ice and snow on February 4.

Q. Do you remember what time you came out of the hotel the next day on February 4?

A. No.

Q. When you came out from the hotel, *did you see snow and ice on the premises of the Residence Inn?*

A. *Yes.*

Q. And do you have a specific recollection of where you saw snow and ice?

A. *There was snow on the ground, on the grass.*

Q. How about on the sidewalks, did you see snow and ice on the sidewalks?

A. No.

Q. *Did you see evidence of any salt application or other ice treatments on the sidewalks?*

A. Yes.

Q. And I'm talking about the morning of February 4, the day before you fell.

A. *I'm pretty sure there was.*

. . . .

Q. And *when you came back in the evening of February 4, did you still observe snow and ice in the parking lot?*

A. *Yes.*

Q. And *did you still observe snow and ice on other places on the premises?*

A. *Yes.*

Q. *Were temperatures freezing in the evening?*

A. *I'm sure they were below freezing at some point.* I don't know what time of the day.

(Emphasis supplied).

In a telephone interview with an insurance adjuster on February 9, 2004, for the accuracy of which the appellant later vouched in his deposition, the appellant described the general weather conditions during his two-day stay at the Residence Inn.

Q. And *can you tell me a little bit about the weather during those two days that you were there?*

A. We didn't get any [precipitation] but *the ground was still—most of it had started melting but there was still ice—ice and snow on the ground in spots.*

Q. Okay, so something had happened before you got there?

A. Yes.

Q. *And was it pretty cold out? 30's–20's?*

A. *Yes. I'm not sure what the temperature was that morning, but it was below freezing.*

(Emphasis supplied).

On February 3 and 4, the appellant "had encountered slippery conditions" on the parking lot.

Q. On the days that you had been at this hotel *on February 3rd and February 4th, you had encountered slippery conditions while driving in that parking lot;* is that right?

A. *Yes.*

(Emphasis supplied).

The appellant acknowledged his general familiarity with the phenomenon of black ice.

Q. Prior to February of 2004, *had you ever encountered black ice before?*

A. *Yes.*

Q. *Had you heard of it before?*

A. *Yes.*

Q. Were you aware that ice was slippery?

A. Yes.

Q. Were you aware that if you walked on ice you could fall?

A. Yes.

Q. Were you aware that if you fell you could be injured?

A. Yes.

The appellant left the Residence Inn at eight o'clock in the morning. He acknowledged that the temperature had been below freezing overnight. Even if the parking lot had been plowed on the afternoon of February 4, the appellant was aware of the danger of melting and refreezing.

Q. Prior to walking out of the hotel *on February 5th you were aware that there was snow and ice in this parking lot; is that right?*

A. *Yes.*

Q. *You were aware that temperatures had dropped below freezing the night before; is that right?*

A. Didn't know the exact temperature, but *yes.*

Q. But *you understood that there could be frozen areas—*

A. Yes.

Q. *—in the parking lot;* correct?

A. *Yes, sir.*

Q. And you understood that snow piles in the parking lot may have melted and frozen?

. . . .

Q. Had you ever encountered that before in your life?

A. Like I said, *I knew there was black ice, yes.*

Q. Okay. *You were aware that there could be black ice in the parking lot before you walked into the parking lot?* Is that right?

A. I did not. *I mean it's a possibility, yes.*

Q. My question is were you aware that was a possibility before you walked into the lot on February 5th?

A. I really didn't think about it. I was on the way to work, but sure, *there was a possibility.*

Q. *You were aware that any wet spots that were in the parking lot overnight could freeze, is that fair to say?*

A. *Yes.*

(Emphasis supplied).

On the morning of the fall, the appellant abandoned a position of safety at the front entrance, where automobile passengers could be safely picked up or dropped off, and voluntarily ventured out onto the parking lot for the apparent purpose of saving a little time. He further abandoned the relative safety of the sidewalk and stepped over the ice and snow shoveled up against the curb and out onto the parking lot. He knew that it was eight o'clock in the morning and he acknowledged that the temperature had been below freezing overnight. The danger posed by melting and refreezing was clear. The appellant himself stated that although he had reason to believe the sidewalk had been salted or otherwise treated, he had no reason to believe that the parking lot itself had been so treated:

Q. Okay. When you came out the front door and walked on the sidewalk, did you see any snow and ice on the sidewalk?

A. No.

Q. *Did you see any evidence of salt or other treatment on the sidewalk?*

A. *Yes, I believe there was.*

Q. I'm sorry?

A. I just said I believe there was, yes.

Q. *Did you see any evidence of salt or other ice treat-ment in the parking lot?*

A. *No.*

(Emphasis supplied).

The appellant described his stepping out onto the parking lot that he knew had been slippery on the day before.

Q. Okay. And you said there was ice that you could see on the parking lot area?

A. The ice that you could see was right up as soon as you stepped off of the sidewalk.

Q. Okay.

A. Right up against the curb.

Q. Okay. And then *you said it was black ice that you fell on?*

A. *Yes.*

Q. *And that was in the parking lot?*

A. Yes.

Q. And do you recall at all where you were looking at the time? Were you talking to somebody or looking at your vehicle?

A. No, no I was trying to watch where I was walking.

Q. *Had spots in the parking lot been slippery the couple of days before?*

A. *A lot of the parking lot was slippery as far as driving,* but I hadn't had any problems walking until this happened that morning.

(Emphasis supplied).

### Appellant Assumed the Risk

We agree with both the appellees and with Judge Rubin that when the bits and pieces of information about the appellant's awareness of risk came together, they were enough,

objectively, to achieve critical mass. The question was properly one of law for the court to decide on summary judgment. In each of the cases of *Schroyer v. McNeal, ADM Partnership v. Martin,* and *Morgan State v. Walker,* the Court of Special Appeals had held that the issue of whether the plaintiff possessed a sufficient awareness of the risk to be deemed to have assumed the risk was a question of fact for the jury to determine. In each case, the Court of Appeals reversed this Court and held that the evidence of the awareness of risk was sufficient for the judge to make that determination as a matter of law.

In this case, of course, there are no disputed first-level facts. There is only the conclusory question of what significance to give to those undisputed facts. The ultimate issue, moreover, is not the subjective question of whether this appellant was consciously aware of the risk as he ventured out onto the parking lot on the morning of February 5, 2004, but the objective question of whether a reasonable person, knowing what the appellant knew, would have been aware of the risk. As Judge Bell framed the issue in *Schroyer v. McNeal,* 323 Md. at 284, 592 A.2d 1119:

> *[W]hen* it is clear that *a person of normal intelligence* in the position of the plaintiff *must have understood the danger, the issue is for the court.*

(Emphasis supplied).

To assume a risk as a matter of law, a plaintiff, objectively speaking, must have reason to know of the risk. In a case such as this, the risk is that of slipping on ice. The required knowledge is not knowledge that ice is actually present. It is the appreciation of the reasonable likelihood that, under the weather conditions and other circumstances, ice might well be present. The assumed risk is not that of stepping on ice *per se.* The assumed risk is that of stepping onto an unknown surface with an awareness that it might well be icy. With white ice, you see it is there. With black ice, you infer the likelihood that it may be there. Either establishes the ele-

ment of awareness. We affirm the grant of summary judgment.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**