6 A.3d 304

Mary THOMAS

v.

PANCO MANAGEMENT OF MARYLAND, LLC, et al.

No. 2508, Sept. Term, 2008.

Court of Special Appeals of Maryland.

Oct. 1, 2010.

Steven M. Weisbaum, Rockville, for appellant.

Mark A. Kozlowski (John P. Panteleakis, Eccleston & Wolf, PC, on the brief), Hanover, for appellee.

Panel: * SALMON, JAMES P., EYLER, DEBORAH S., and GRAEFF, JJ.

SALMON, J.

Mary Thomas fell on ice on the sidewalk in front of her apartment building on February 21, 2007, and as a consequence of the fall she fractured her right leg. Approximately six months after her fall, Thomas filed a negligence action in the Circuit Court for Prince George's County against the owner of the apartment complex where she lived, Foxfire Associates Limited Partnership, and the management company that ran the apartment complex, Panco Management of Maryland, LLC.

A jury trial commenced on December 8, 2008, the Honorable Sean D. Wallace, presiding. At the conclusion of Thomas's case, Judge Wallace granted the defendants' motion for judgment on the grounds that Thomas had, as a matter of law, assumed the risk of injury.

On appeal, Thomas raises two issues, which we have condensed into one:

> Whether the court erred when it concluded, as a matter of law, that the appellant knowingly and voluntarily assumed the risk of slipping on "black ice" when she left her apartment to pick up her granddaughter from a meeting at her church.

---

\* James P. Salmon, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a specially assigned member of this Court.

# I.

## Facs [1]

On February 21, 2007, Thomas lived at apartment 202 in the Foxfire Apartment complex in Laurel, Maryland. Residing with her were Thomas's granddaughter, Whitney Kay, age 16, and her daughter, Jennifer Kay, age 36. Thomas had lived at apartment 202 since 1998. During the entire period Thomas lived in apartment 202, her downstairs neighbor (in apartment 101) was Jeanne Gillete ("Gillete").

Immediately in front of the apartment building where Thomas and Gillete lived was a parking lot. To get to the parking lot, tenants in Thomas's building had to traverse a flight of stairs that was covered by a roof; then descend four additional stairs to a sidewalk. Thomas's fall occurred as she left the last stair and stepped onto the sidewalk. The fall occurred because the portion of the sidewalk upon which Thomas stepped was covered with what Gillete was later to describe as "black ice." The portion of the sidewalk where Thomas fell was only a few feet from the place in the parking lot where Thomas's car was parked.

Thomas testified that the area in front of her apartment building does not get much direct sunlight. As a consequence, in the winter, snow and ice tended to stay much longer than it did in other locations. And, as Thomas knew before the accident, when the snow and ice melted, the water would flow onto the sidewalk, and make the sidewalk wet. She also knew that; "as a consequence of the snow melting and running out onto the sidewalk at night," icy conditions could develop if temperatures fell below freezing.

Weather records introduced into evidence by Thomas showed that on the date of the accident the temperature reached a high of 51°.

---

1. The facts set forth in Part I are all based upon evidence introduced by plaintiff at trial. Absent from our summary of the facts introduced by Thomas are those unnecessary to the resolution of the question presented.

Thomas testified that on the morning of the accident, she left for work at approximately 8:30 a.m. The weather was cold and clear and she noticed, "in different areas" on the sidewalk in front of her apartment, that snow and ice had accumulated. In fact, as she entered her vehicle, which was parked in a space directly in front of her building, she had to hold onto it for support because there was ice. And, appellant could see the ice in the parking lot. When she returned from work at between 2:30 and 3:00 p.m., weather conditions had "warmed up" and the ice and snow were gone. She noticed, however, that the sidewalk was wet. She saw no sign that the apartment complex's maintenance men had cleared snow or ice while she was at work.

Thomas left her apartment once again at "a little after 6 [p.m.]" on the evening of the accident. The reason she left her apartment was to drop off her granddaughter, Whitney, at a youth group meeting at the local Baptist church. At that point the temperature was falling. She returned home at approximately 6:15 p.m. When she did so, Thomas noticed that the sidewalk in front of her apartment was wet and also noticed that there was no sign of salt or melting pellets on the sidewalk or walkway.

At approximately 8:00 p.m. Thomas left her apartment again to pick up her granddaughter from the church. As she stepped down from the last step of the stairway onto the sidewalk, she slipped on ice that was on the sidewalk and fell. Before she stepped onto the sidewalk she did not see the ice. Very shortly after the fall, Thomas's neighbor, Ms. Gillete, along with another resident, came to Thomas's assistance. As Ms. Gillete stepped off the last step onto the sidewalk she saw what she believed to be a wet spot or "black ice" that caused her to slip but not fall.

Gillete testified that she had arrived home from work at about 5:00 or 5:30 p.m. and noticed that the sidewalk was wet. It still looked wet at the time of the accident and she explained that "[w]ater can appear to be glassy as well as ice."

Gillete testified that the maintenance staff at the apartment complex where she had lived for the last 19 years was "generally responsive to calls for maintenance." She further testified that as a long-time resident of the apartment complex she was aware that the walkways and the sidewalks were susceptible to having fallen snow melt and run onto them. And, as a consequence of that knowledge she was generally cautious when she left her house during the winter months.

Thomas, on cross-examination by counsel for the appellees, had similar knowledge:

Q. Now, apart from you knowing about this phenomena, this snow being retained, and when snow would melt it would run onto the sidewalks, apart from your personal knowledge, based on your own conversations with other residents, that was a common knowledge throughout that building—

A. Yes.

Q. —correct?

A. Yes, that's correct.

Q. And you had discussed that condition, certainly, with your neighbors?

A. Yes. It was a joke. I mean, we were going to have it until April because nothing was going to get done.

Q. Ma'am, you knew also, as a consequence of the snow melting and running out onto the sidewalks that at night, if temperatures fell below freezing, icy conditions could develop?

A. They could develop.

Q. Now, given that the residents, well, your neighbors and you knew that ice could form following a thaw, a reasonable person would take due care when leaving the building at night, wouldn't you agree?

A. Sure, I would. And I know that we all do.

Q. And you would agree that a reasonable person would be cautious. And being cautious would include watching where you are going, correct?

A. Exactly.

Q. And a reasonable person being cautious would be cautious and looking down at where they were walking, is that correct?

A. That's correct.

Q. A reasonable person being cautious would also be looking for wet portions of the sidewalk as they were walking at night after a thaw?

A. Right. Wet portions. Right.

Q. Correct. And a reasonable person acting cautiously would also be looking for ice?

A. And if they saw it, they would walk around it.

Q. But my point, Ms. Thomas, is this. That with that knowledge, with that—

A. If you see it, yes.

Q. Well, let me finish my question, ma'am. With that unique knowledge about that condition at your property, you would agree with me that a reasonable person under those conditions when they would leave at night would be looking for ice?

A. Yes. And again, if you saw it, you would walk around it.

Q. Based on your own personal observations over those nine years, you had seen ice on the sidewalks out in front of your building before, is that correct?

A. Yes, sidewalk and parking lot.

Q. And the ice wasn't always in the same place, was it?

A. No.

Q. It would be various places at various different times, is that correct?

A. That's correct?

Thomas's daughter, Jennifer Kay, testified that she was at work at the time of her mother's accident. She said on cross-examination that to her knowledge there would not have been

any adverse consequences if her daughter had not attended the church meeting on the night of the accident.

Lawrence Dinoff, who was qualified as an expert in "forensic architecture," testified that in the area where the accident occurred the lawn was higher than the sidewalk, which meant that if snow on the grass melted it would run onto the sidewalk. He characterized the sidewalk as "sunken" and criticized the design of the sidewalk and walkways as deficient in several ways, some of which fostered the accumulation of ice.

According to Mr. Dinoff, weather records at Baltimore Washington Airport, which was not far from the scene of the accident, showed that it snowed on February 14, 2007, and that on February 20, 2007, the high temperature was 47 degrees. On the date of the accident, February 21st, the high temperature was 51 degrees. According to Mr. Dinoff, the temperature did not go below freezing on the date of the accident until about "an hour before . . . [Thomas's] fall occurred."

## II.

### The Trial Judge's Opinion

In granting the motion for judgment in favor of the defendants, Judge Wallace first noted that our opinion in *Allen v. Marriott Worldwide Corp.*, 183 Md.App. 460, 961 A.2d 1141 (2008), had been decided the previous day. Judge Wallace said, in pertinent part:

In this case, there is no dispute about the underlying facts, the first level facts that the sidewalk was wet. It was observed to be wet and known to be wet by the plaintiff on the four other occasions that she traversed it that day. And she, and that the weather was, from the last time, that would be 6 o'clock until 8 o'clock, that the weather was getting colder. She said she saw no salt or any evidence of any salting being done. And that she was aware, as were all of her neighbors, that water would collect in that area, melting snow made the sidewalks wet, and thus they all took

due care being cautious and looking for ice. She didn't see any sign of any maintenance activity that day, that evening. She wasn't looking for salt, and she wasn't looking for ice. And nonetheless, she did attempt to traverse that wet area and fell.

I find this is almost exactly the *Allen* case. The test as set forth in the *Allen* decision is a plaintiff objectively speaking must have reason to know of the risk. In a case such as this, the risk is that of slipping on ice. The required knowledge is not knowledge that ice is actually present, which is what we all were talking about prior to yesterday, but it is the appreciation of the reasonable likelihood that under the weather conditions and other circumstances, ice might well be present.

The assumed risk is not that of stepping on ice, *per se.* The assumed risk is of stepping onto an unknown surface with an awareness that it might well be icy. With white ice, you see it there. With black ice, you infer the likelihood that it may be there. Either establishing the element of awareness.

So, I do find that as a matter of law, she was or should have been aware of the risk, that she appreciated it because she said she was familiar with it, and that she voluntarily assumed that risk by undertaking to cross it that day. Because I don't find that the mere fact that she was a tenant means that any otherwise voluntary acceptance of the risk or confrontation of the risk somehow becomes involuntary because of the tenant relationship.

There were alternatives, some of which were discussed here. And the alternative of not taking her granddaughter out for that event, and knowing that you'd have to pick her up again after the temperature had dropped under those circumstances. So, for all of those reasons, I frankly don't see that I have any choice but to grant the motion for judgment on the basis of the assumption of the risk....

### III.[2]

"[T]o establish the defense of assumption of risk, the defendant must show that the plaintiff: 1) had knowledge of the risk of the danger; 2) appreciated that risk; and 3) voluntarily confronted the risk of danger." *ADM Pshp. v. Martin*, 348 Md. 84, 90–91, 702 A.2d 730 (1997).

> In determining whether a plaintiff had knowledge and appreciation of the risk, an objective standard must be applied and a plaintiff will not be heard to say that he did not comprehend a risk which must have been obvious to him. Thus, "when it is clear that a person of normal intelligence in the position of the plaintiff must have understood the danger, the issue is for the court." Moreover, "there are certain risks which anyone of adult age must be taken to appreciate: the danger of slipping on ice, of falling through unguarded openings, of lifting heavy objects . . . and doubtless many others."

*Allen*, 183 Md.App. at 466, 961 A.2d 1141 (emphasis omitted).

In *Allen*, the Court said:

> The term "black ice" describes the visual impression created by a relatively thin layer of transparent ice lying over a black surface, such as tar macadam or asphalt. "White ice" describes the different visual image created by a similar layer of transparent ice lying over a white surface, such as snow. By parity of reasoning, there is no reason to suppose that there could not also be such visual phenomena as "red ice" or "yellow ice" or "blue ice" or, for that matter, "harlequin ice," but these potential phenomena have not yet made it into the lexicon of tort law. It will readily be seen that "black" and "white" do not describe the actual ice itself but, rather, the color of the surface beneath the ice. Although the meaningful contrast should be between essential-

---

**2.** In reviewing a trial judge's grant of a motion for judgment in a jury trial, we must conduct the same analysis as the trial judge, viewing the facts presented at trial, together with all inferences that can reasonably be drawn from those facts, in the light most favorable to the non-moving party. *See* Md. Rule 2–519(b).

ly visible ice and essentially invisible ice, the linguistic usage of attaching the chromatic adjective to the ice has nonetheless taken firm root. We are, after all, dealing with torts, not optics. "White ice" and "black ice" comfortably serve the law's purpose, and we will happily go with the flow.

*Id.* at 469–70, 961 A.2d 1141.

At the time of the accident, Thomas knew: 1) that on the date of the accident there was ice on the sidewalks when she left for work at 8:30 a.m., 2) ice was also present on the parking lot at 8:30 a.m., which caused her to hold on to her car for support, 3) that when the snow melted it would make the sidewalks wet, 4) that at approximately 6:00 p.m. the weather was getting colder, 5) that at 8:00 p.m. (approximately) the temperature was falling when she left her apartment to pick up her granddaughter, and 6) that "as a consequence of the snow melting and running onto the sidewalk, . . . if temperatures fell below freezing, icy conditions could develop."

 Under these conditions, what was said in *Allen* is here apposite:

> To assume a risk as a matter of law, a plaintiff, objectively speaking, must have reason to know of the risk. In a case such as this, the risk is that of slipping on ice. The required knowledge is not knowledge that ice is actually present. It is the appreciation of the reasonable likelihood that, under the weather conditions and other circumstances, ice might well be present. The assumed risk is not that of stepping on ice per se. The assumed risk is that of stepping onto an unknown surface with an awareness that it might well be icy. With white ice, you see it is there. With black ice, you infer the likelihood that it may be there. Either establishes the element of awareness. We affirm the grant of summary judgment.

*Id.* at 479–80, 961 A.2d 1141.

The facts of this case are somewhat similar to the ones that confronted this court in *Allen, supra.* David Allen and his wife were guests at the Residence Inn on February 3 thru February 5, 2004. *Id.* at 462, 961 A.2d 1141. Mr. Allen

observed snow and ice on the parking lot and on other places on the premises on the evening of February 4. *Id.* at 475, 961 A.2d 1141. On February 5 the temperature was below freezing. *Id.* at 475, 961 A.2d 1141. That morning Mr. Allen checked out of the hotel while his wife went to the hotel's parking lot to get their car. *Id.* at 462, 961 A.2d 1141. Mrs. Allen then drove their automobile close to the front entrance way and awaited her husband. *Id.* As Mr. Allen left the main entrance way of the hotel, he first walked along the sidewalk in the general direction of where his wife was waiting. *Id.* When he stepped off the curb, he slipped and fell on what turned out to be a patch of unseen ice. *Id.*

The motions judge granted summary judgment in favor of the defendants and against Mr. Allen. On appeal, Allen argued that because he did not see the ice that he slipped on, he therefore lacked the "requisite knowledge element of the assumption of the risk" defense. *Id.* at 471, 961 A.2d 1141. This Court held that even though Mr. Allen did not see the ice that caused him to fall, the evidence showed that with the various "bits and pieces of information" that he possessed he had sufficient awareness of the risk to be deemed to have assumed it. *Id.* at 478–79, 961 A.2d 1141. In the words of the *Allen* Court, "knowledge springs not only from direct sense impressions but from the drawing of inferences from circumstantial evidence. Induction is as worthy a highway to knowledge as is sensation." *Id.* at 473, 961 A.2d 1141.

We agree with Judge Wallace that the uncontradicted first-level facts developed in this case objectively showed that Thomas, like David Allen, had at the time of her fall, knowledge of the risk that she might be stepping down upon ice and that a reasonable person in her position would have appreciated the danger of that action.

Appellant argues: "Assuming *arguendo* that knowledge and appreciation of the danger of slipping on ice could be imputed to Ms. Thomas, satisfying the first two prongs of the assumption of risk defense, as to the third prong her assumption of the risk was not voluntary under applicable case law." In

support of this last argument, Thomas stresses that she had no alternative means of egress from her apartment to the parking lot. Thomas relies on *Rountree v. Lerner Development Co., et al.,* 52 Md.App. 281, 447 A.2d 902 (1982), to support her argument that the "voluntary" component of the assumption of the risk defense was not shown.

Ginger Rountree was injured when she fell on an ice-covered step outside her apartment building. *Id.* at 282, 447 A.2d 902. On the day of the accident, Ms. Rountree awoke between 5:30 and 6:00 a.m. and from her balcony "noticed an accumulation of ice and snow." *Id.* at 283, 447 A.2d 902. Although she was due at work at 9 a.m., she decided to wait to leave her apartment until 9 a.m. in order to allow the streets and pathways to be cleared. *Id.* at 283, 447 A.2d 902. When she left her apartment for work she saw the snow and ice on the sidewalk, and proceeded with great caution. *Id.* Ms. Rountree claimed that she had no choice but to use the steps in front of her apartment, even though she knew that they were "slick and icy," and "there was no handrail or grip to aid her in ascending the stairs." *Id.* She successfully took two steps up the stairway, but when she took a third step she fell. The trial court granted the defendant's motion for directed verdict, concluding, as a matter of law, that Ms. Rountree had assumed the risk of her fall. *Id.* at 282, 447 A.2d 902.

The *Rountree* Court concluded that Ms. Rountree had produced enough facts to present a jury issue with respect to whether she assumed the risk of injury. *Id.* at 285, 447 A.2d 902. The Court said:

On the facts of this case, there may have been clear and decisive evidence of a "deliberate encountering of a known danger" but that fact, even if assumed to be true, is not dispositive of the issue of assumption of risk. In this case, the tenant had a right to egress from her apartment. She had a right to assume that the landlord would take all appropriate steps to make safe egress possible. Whether the landlord did or did not is another issue and not the one upon which this case was decided. There was evidence that the appellant delayed her departure for work so that both

the sun and the workmen would have additional time to ameliorate the icy conditions. There was evidence that there was no alternative route of egress from the appellant's apartment....

\* \* \*

If there had been evidence in this case that there was a reasonable and safe alternative route of egress open to the appellant and that she deliberately chose the shorter but more dangerous route, that might well establish as a matter of law that she was guilty of having assumed the risk....

52 Md.App. at 285–86, 447 A.2d 902.

The trial judge in the case at hand expressed the view that *Rountree* is no longer the law in Maryland. He based that conclusion on the fact that all the cases relied upon by the court in *Allen* "post-date *Rountree* by a great deal of time." The post–*Rountree* decisions referred to by the court were *Schroyer v. McNeal,* 323 Md. 275, 592 A.2d 1119 (1991); *ADM Partnership, supra;* and *Morgan State University v. Walker,* 397 Md. 509, 919 A.2d 21 (2007).

In *Odenton Dev. Co., v. Lamy,* 320 Md. 33, 575 A.2d 1235 (1990), which was decided about eight years post–*Rountree,* the alternative to stepping over the snow was not an alternative safe route, but was, instead, an alternative safe *course of action,* i.e., the plaintiff could have waited at the front of the store for her friend (who was already in the car) to bring the car around to the front of the store so that the groceries could be loaded safely. 320 Md. at 44, 575 A.2d 1235.

In *Schroyer,* the plaintiff, Frances McNeal, arrived at a hotel not long after four inches of snow had fallen. *Schroyer,* 323 Md. at 278, 592 A.2d 1119. She observed that the area in front of the main entranced to the hotel had been cleared of ice and snow, but noticed that the rest of the parking lot had not. *Id.* Because she had a lot of paper work to carry from her car to her room, McNeal asked for a hotel room closest to an exit. *Id.* Although the room that the plaintiff was given was accessible from the main lobby, she chose to drive her car away from the main entrance to a different entrance which was closest to her room so that she could move her paperwork

more easily. *Id.* Plaintiff parked her vehicle on packed ice and snow and observed that the area was slippery. *Id.* at 278–79, 592 A.2d 1119. She removed her belongings from the car and entered the hotel without incident, but on her way back to the vehicle to retrieve additional items, she fell breaking her ankle. *Id.* at 278, 592 A.2d 1119. The Court of Appeals reversed the judgment in favor of the plaintiff, and held that, as a matter of law, McNeal assumed the risk of her injury. *Id.* at 283–84, 592 A.2d 1119.

Sixteen years after *Schroyer* was decided, the Court of Appeals once again addressed the assumption of the risk defense in *Morgan State, supra.* The Court ruled in *Morgan State,* that the plaintiff's claim was barred by the assumption of risk doctrine. In *Morgan State,* the plaintiff, Pamela Walker, was the mother of a college student. She drove to the college several days after a snow storm because her daughter needed money for gas and other things, and had no ATM card or debit card. *Id.* at 511, 919 A.2d 21. After Ms. Walker parked her vehicle in the school's parking lot, which was covered by snow and ice, she got out of her vehicle and fell on some ice as she attempted to go towards her daughter's dormitory room. In *Morgan State,* the Court said:

> Nothing in the record suggests that [Ms. Walker] Respondent was forced against her will to confront the risk of danger of walking on the snow and ice, such that her behavior could be classified as involuntarily. After hearing the crunch of ice and snow under her tires and acknowledging that MSU had not removed the ice and snow from the parking lot, she proceeded to get out of her car and visit with her daughter. Respondent's motivation stemmed from the fact that she believed that her daughter needed money. *In accordance with our prior holdings, Respondent's actions would be considered involuntary only if she lacked the free will to avoid the situation. See ADM P'ship,* 348 Md. at 94–95, 702 A.2d at 736 (holding that Martin proceeded voluntarily in the face of danger despite the fact that she thought she would lose her job if she did not deliver the blueprints); *Gibson,* 245 Md. at 422, 226 A.2d at 276 (stating that even though Gibson was told that he could not have fuel

oil in his house if he did not pull the oil hose from the truck to his house, Gibson acted voluntarily because he still had the choice to accept or reject the fuel oil); *Burke v. Williams,* 244 Md. 154, 158, 223 A.2d 187, 189 (1966) (concluding that appellant acted voluntary when he walked on the slippery, poorly constructed walkway because he was not forced against his will to do so). Therefore, the fact that Respondent wanted to bring her daughter money for gas does not render her actions involuntary.

397 Md. at 519–20, 919 A.2d 21 (emphasis added).

In the *Morgan State* case, Ms. Walker argued, unsuccessfully, that the *Schroyer* case was not on point because she, unlike the plaintiff in *Schroyer,* did not have an alternative safe path. In *Morgan State,* the Court rejected the distinction suggested and held that *Schroyer* was dispositive. It explained:

Respondent argues that *Schroyer* is not apposite here because in *Schroyer,* McNeal had other alternative paths upon which to walk and, in the case sub judice, Respondent states that she did not have any other reasonable alternative paths from her car to her daughter's dormitory. We disagree with this interpretation of *Schroyer. Our holding in Schroyer was not based upon the existence of other alternatives. Schroyer,* 323 Md. at 288 [592 A.2d 1119]. *Our conclusion was based upon the fact that McNeal knowingly and voluntarily assumed the risk when she walked across the parking lot. That McNeal could have parked near the entrance and walked on the cleared portion of the parking lot merely provided additional support for our conclusion in Schroyer.* Moreover, Respondent had alternatives in this case—as soon as she heard the ice underneath her tires, she could have turned her car around and gone home or arranged an alternative plan by which to get her daughter money, instead of voluntarily proceeding in the face of danger by leaving her car and traversing across ice and snow. *Schroyer* is therefore dispositive.

*Id.* at 520, 919 A.2d 21 (emphasis added).

The Court of Appeals concluded its *Morgan State* opinion with a footnote that read:

See also *Odenton Dev. Co. v. Lamy*, 320 Md. 33, 575 [A.2d 1235] (1990), where we declined to adopt *Rountree*. In *Lamy*, Bernice Lamy attempted to step over a mound of snow to put her groceries in her car and fell, injuring herself. *Lamy*, 320 Md. at 36 [575 A.2d 1235]. She sued the owner and operator of the grocery store. *Lamy*, 320 Md. at 36–37 [575 A.2d 1235]. At trial, the judge submitted the following instructions to the jury: The defense of assumption of the risk rests upon the Plaintiff's consent to relieve the Defendant of obligation of conduct toward the Plaintiff and to take his chances of harm from a particular risk ... such consent may be found by implication from the conduct of the party. When a Plaintiff enters voluntarily into a situation involving obvious danger, the Plaintiff may be taken to assume the risk and relieve the Defendant of responsibility. Such implied assumption of risk involves knowledge and appreciation of the risk and voluntary choice to encounter it. *Lamy*, 320 Md. at 43 [575 A.2d 1235]. The respondent argued that the jury should have been told that if it determined that there existed no alternative safe routes of exit out of the grocery store, then it could not find that the respondent assumed the risk because she had a right of egress as a business invitee. *Lamy*, 320 Md. at 42 [575 A.2d 1235]. She argued that *Rountree* was dispositive to the analysis of her case. The trial court rejected that jury instruction and we determined that the trial court did not err in doing so. *Lamy*, 320 Md. at 43 [575 A.2d 1235]. We stated explicitly that the respondent's "reliance on *Rountree* [wa]s misplaced" and that there existed no error in the trial court's instructions because the record demonstrated that the respondent knew of the conditions, was aware of the alternatives to stepping over snow to get to her car, and that she voluntarily chose to put the groceries in her car in the manner that she did. *Lamy*, 320 Md. at 43–44 [575 A.2d 1235].

397 Md. at 522–23, n. 3, 919 A.2d 21 (2007).

Based on the excerpts from *Morgan State* quoted *supra*, it does not appear that the Court of Appeals would presently

completely endorse our holding in *Rountree*. It no longer can be said that the assumption of the risk doctrine is inapplicable simply because the plaintiff is provided with no alternative *safe path* to reach his or her destination. Nevertheless, we *infer* from *Morgan State* that for an act to be voluntary, the plaintiff must still have some safe alternative *course of action*—such as those suggested in *Morgan State*, 397 Md. at 520, 919 A.2d 21. The safe alternative course of action, often, can simply be to refuse to take the risk. For instance, in *ADM Partnership*, the plaintiff-employee fell on an icy sidewalk as she attempted to make a delivery to a business owned by the defendants. 348 Md. at 88, 702 A.2d 730. The employee acknowledged that she could have returned to her truck and radioed her employer that it was too dangerous to complete the assigned task. *Id.* at 99, 702 A.2d 730. Under such circumstances, the Court of Appeals determined that there was "no evidence that the employee's act of traversing the ice and snow covered parking lot and walkway was not volitional." *Id.* Instead, the Court determined that the plaintiff-employee assumed the risk of falling on ice. *Id.* at 103, 702 A.2d 730.

In this case, although Thomas did not have an alternative safe path to her car, she did have a safe alternative course of action. One alternative course of action was to call the maintenance department at her apartment complex and ask them to put down salt or some other substance that would melt the ice. Such an alternative course of action would not have been a waste of time because, according to the uncontroverted testimony of Ms. Gillete, the apartment complex was "generally well maintained" and "the maintenance staff [was] generally responsive to calls for maintenance." Alternatively, as Judge Wallace suggested, she could have refused to take her granddaughter to the church because, objectively speaking, she knew that the sidewalk might be icy.

Under the circumstances of this case, we hold that Thomas's assumption of the risk of slipping on ice was volitional.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**